IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

FILED

3:21 pm, 6/9/10

Tim J. Ellis
Clerk of Court

| | |
|---|---|
| In re | ) |
| | ) |
| GENEVIEVE MURAN CROWSON, | ) Case No. 09-20032 |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| UNIWYO FEDERAL CREDIT UNION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. No. 09-2009 |
| | ) |
| GENEVIEVE MURAN CROWSON, | ) |
| | ) |
| Defendant. | ) |

### OPINION ON THE COMPLAINT TO DETERMINE EXCEPTION
### TO DISCHARGE OF DEBT

On April 14, 2010, this matter came before the court for an evidentiary hearing on

the Complaint to Determine Exception to Discharge of Debt filed by UniWyo Federal

Credit Union ("Credit Union") and the Answer filed by the Debtor/Defendant, Genevieve

Muran Crowson, ("Debtor"). The Credit Union was represented by Michael Schilling.

Ms. Crowson was represented by Janet Tyler. The Court having reviewed the record, is

prepared to rule and based upon the following, denies the complaint.

This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and

157(b)(2)(J).

**Facts:**

1.   The Debtor filed for Chapter 7 bankruptcy protection on January 21, 2009.

2.   Her husband, Matthew Crowson, is not a debtor in the bankruptcy.

3.   The Debtor listed the Credit Union's claim on Schedule "F" in the amount of
     $17,211.20, and described it as: "car loan (no lien on title)."

4.   The Debtor was not a member of the Credit Union when she received a promotion
     in the mail advertising vehicle loans.

5.   The Debtor completed a loan application to the Credit Union over the internet to
     borrow $18,900.00.

6.   The collateral for the loan was a 2004 Chevrolet Tahoe ("Tahoe").

7.   The Debtor testified that the Tahoe was part of the property distribution from Mr.
     Crowson's previous divorce.  It was her understanding, that in order to get the ex-
     spouse's name off the title, Mr. Crowson's mother agreed to co-sign a loan at
     Wells Fargo Bank.

8.   The Debtor testified that the reason she responded to the Credit Union
     advertisement was the interest rate was lower than the loan with Wells Fargo and
     she and Mr. Crowson wanted to get Mr. Crowson's mother's name "off the loan."

9.   The Debtor testified that she had never borrowed money for the purchase of a
     vehicle prior to this transaction.  She also testified that she did not know what a
     lien was.

10. During this time, the Crowson's baby was born with complications. The Debtor was in Denver at the hospital with the infant for seven weeks.

11. The Debtor testified that actual conversations between the Debtor and the Credit Union loan officer, Julie Schmidt ("Schmidt") consisted of three telephone calls with a duration of two to three minutes each and one face-to-face meeting at the closing on March 31, 2008.

12. The Debtor testified that she and her husband went to the Credit Union on March 31, 2008, for the loan closing, on their way home from the hospital with their infant daughter. The Debtor signed the loan documents. A check was issued to "Genevieve Muran Crowson or Matthew James Crowson." It was upon the Debtor's request that the check was made to the order of the Debtor and her husband.

13. Mr. Crowson was not a party or borrower on the loan.

14. The Debtor testified that the only discussion she remembered regarding the title to the Tahoe during the loan application process, was at the March 31, 2008 closing. She remembers telling Ms. Schmidt that as soon as she got it, she would "bring it in."

15. Ms. Schmidt testified that she processed the loan application from the information provided by the Debtor via the internet. She obtained a credit report to check the Debtor's credit history. Based on the credit report, there were no indications that

further investigation into the Debtor's financial history was necessary. There was

no indication of a loan with Wells Fargo on the Debtor's credit report. Ms.

Schmidt confirmed that all communication with the Debtor was by telephone

regarding any questions while processing the loan.

16.    Ms. Schmidt testified that it was her understanding that the Debtor was buying the

       Tahoe from a relative.

17.    Ms. Schmidt testified that she was not informed of any lien on the title.

18.    Ms. Schmidt testified that although the Debtor was not a member of the Credit

       Union, at the time of the loan application, she was eligible to join as the Debtor

       was employed by the University of Wyoming.

19.    Ms. Schmidt testified that it is the Credit Union's policy to have the title in its

       possession at closing or an assurance from the party holding the title, that the title

       would be turned over before any loan funds are disbursed.

20.    Ms. Schmidt testified that she did not remember Mr. Crowson being at the closing

       on March 31, 2008 when the Loan Application; Loan and Security Agreement and

       Disclosure Statement; Loan Agreement Addendum; Credit Insurance document;

       Payroll Deduction direct Deposit Authorization were executed.

21.    The Debtor testified that she and her husband immediately took the check to Wells

       Fargo to pay off the previous loan.  She also testified that she understood that

       Wells Fargo would mail the Tahoe's title to the Debtor and her husband.

22. Leslie Johnson, Loan Officer/Title Clerk of Credit Union sent a letter to the
    Debtor, dated August 18, 2008 requesting that the title be forwarded to the Credit
    Union.

23. The Debtor testified that she attempted to contact Ms. Johnson or Ms. Schmidt, but
    neither were available. She testified that she left a message. The Debtor testified
    that at that time, her husband called Wells Fargo to determine the status of the title.
    They were told that titles were held in a facility out of state and someone would
    "look into it and mail the title."

24. Larry Dern, Title Clerk of the Credit Union sent a subsequent letter to the Debtor
    dated October 16, 2008. The Debtor testified that she does not remember
    receiving this letter.

25. The Debtor testified that she met with her bankruptcy attorney in October 2008.
    She stated that at that meeting, she was informed by her husband that he had
    received the Tahoe title and Lien Clearance from Wells Fargo. The documents
    were in his possession. The Debtor testified that she was not aware that he had
    received the title.

26. The Credit Union sent another request for the title by a letter dated February 25,
    2009. The Debtor testified she received this after the bankruptcy was filed and she
    did not respond.

27.   Larry Knopp testified that upon receiving notice of the Debtor's bankruptcy, an

      investigation was initiated to determine why the Tahoe's title was not in the

      member's file. Mr. Knopp testified that it was the Credit Union's policy that the

      title be in the possession of the Credit Union before funds are disbursed.

28.   The Certificate of Title for the Tahoe, issued January 17, 2007 shows that the

      owner is listed at Matthew J. Crowson. The Title also shows a first lien holder of

      Wells Fargo Bank NA, filed on that same date. The Lien Clearance is dated April

      15, 2008 and filed at the Albany County Clerk's office on April 29, 2009.

**Discussion:**

A court may deny a discharge of a debtor for money...obtained by false pretenses,

a false representation, or actual fraud...[1]  A creditor must show, by a preponderance of the

evidence, that a debtor made a misrepresentation; the debtor made the misrepresentation

with the intent to deceive; the creditor justifiably relied on the misrepresentation; and that

the misrepresentation cause the creditor to sustain damages. Discharge provisions will be

strictly construed against the creditor and liberally construed in favor of the debtor's

discharge.[2]

False pretenses or representations are representations knowingly and fraudulently

made that gives rise to the debt. Courts define "fraudulent misrepresentation" as one who

---

[1] 11 U.S.C. §523 (a)(2)(A).

[2] *In re Zolnosky*, Case no. 7-07-11879; Adv. No. 07-1157, 2008 Bankr. LEXIS 3348
(Bankr. N.M. August 28, 2008).

fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose

of inducing another to act or to refrain from action in reliance upon it, is subject to

liability to the other in deceit for pecuniary loss caused by him by his justifiable reliance

upon the misrepresentation.[3]

Intent to deceive is a question of fact which can be inferred based on the totality of

circumstance.[4]  A plaintiff can satisfy the element through circumstantial evidence from

which a court may infer the requisite intent to defraud.  The court must consider the

totality of the circumstances as of the time the representation was made to determine

whether the debtor had a subjective intent to defraud the creditors.[5]  The court may

logically infer an intent to deceive if the debtor knowingly or recklessly makes a false

representation that the debtor knew or should have known would induce another to act.[6]

The Credit Union alleges that the Debtor obtained the loan funds by false

pretenses, false representation or actual fraud.  The Credit Union asserts that the Debtor

made false and misleading material misrepresentations concerning the vehicle that was to

become the collateral for the loan.  The Credit Union further asserts that the Debtor

---

[3] *In re McGuire,* 284 BR. 481 (Bankr. D. Colo. 2002 (citing Restatement (Second) of
Torts §525 (1976).

[4] *In re Baines*, 337 BR. 392 (Bankr. D.N.M. 2006).

[5] *In re Young,* 91 F.3d 1367 (10th Cir. 1996).

[6] *In re Horst,* 151 BR. 563 (Bankr. D.Kan. 1993).

falsely represented that she would present the Tahoe title to allow the Credit Union to

perfect its security interest. The Credit Union relied upon the false representations;

loaned the funds to the Debtor; was not able to protect its security interest in the collateral

and was harmed upon Debtor filing for bankruptcy protection because it was an

unsecured creditor. The Debtor represented that she would use the loan proceeds to

purchase the vehicle. Debtor did not represent to the Credit Union that someone else had

an interest or claim against the collateral. Debtor represented that she would do all that

was necessary and requested by the Credit Union to protect the Credit's Unions security

interest in the Tahoe. The Credit Union alleges that it reasonably relied on the Debtor's

representation.

It appears to the Court that there was a total break-down of communication

between the Debtor and Ms. Schmidt. At the time the loan application was made and

completed, the Debtor appears to have been a financially unsophisticated individual. She

testified that she had not borrowed money prior to this transaction and did not understand

the process. It is also apparent to the court that she did not know or understand the facts

regarding the status of the Tahoe title and loan and the significance those facts would

have had on the loan application with the Credit Union. At that time she did not know or

understand what a "lien" was or have an understanding of the process of borrowing,

security interests or titles.

The Debtor testified that during the time that she was undergoing the loan process and talking to the Credit Union loan officer, Ms. Schmidt, she also was in Denver with an infant child, born with complications. The telephone calls between the parties, were held after the Debtor received a message from Ms. Schmidt, came out of the neonatal unit and returned the call which lasted a minimal amount of time.

The Court does not doubt the credibility of either the Debtor or Ms. Schmidt. In considering the totality of the circumstances, it does not appear to the Court that the Debtor's statements were to misrepresent. She told the loan officer what she knew or thought she knew about the circumstances of the Tahoe. Her representations to the Credit Union were incomplete, based on unfamiliarity of the process and the circumstances of her life at that time.

The Court also finds that in reviewing the totality of the circumstances, the Debtor's statements do not show the requisite intent to deceive. The Debtor was uninformed of the loan process and responded on that level. Her testimony and the surrounding facts do not show she made statements with the intent to knowingly and fraudulently induce the Credit Union to approve the loan. Additionally the Court finds that her statements regarding providing the title to the Credit Union were not for the purpose of preventing the Credit Union from securing its collateral for the loan. The Debtor was not aware of the importance of the title being in the Credit Union's possession or having its lien on the title for the purpose of protecting is security interest.

Page 9

**Conclusion:**

The Credit Union, having not met its burden of proving by a preponderance of

evidence that the that the Debtor intentionally obtained the loan funds by false pretenses,

false representations, or actual fraud is denied the requested relief. The Debtor's

discharge shall be allowed. This opinion constitutes the Court's findings of fact and

conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this ____9____ day of June, 2010.

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
   Michael Schilling
   Janet Tyler